PAUL E. MARSHALL AND BETTY G. MARSHALL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marshall v. Commissioner
Docket No. 781-84
United States Tax Court
T.C. Memo 1988-524; 1988 Tax Ct. Memo LEXIS 549; 56 T.C.M. (CCH) 618; T.C.M. (RIA) 88524; November 10, 1988
Irvin H. Harlamert, for the petitioners. Nancy B. Herbert, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1981 in the amount of $ 17,837. After concessions, [1] the issue for decision is whether petitioners are entitled to depreciation deductions and investment tax credits in connection with certain advertising displays and amusement park rides. *552 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Paul E. and Betty G. Marshall are husband and wife. At the time they filed their petition in this case they resided at 3041 Big Hill Road, Kettering, Ohio 45419. Petitioner Betty G. Marshall signed some of the operative documents, but all references to petitioner in the singular are to petitioner Paul E. Marshall. At the time of trial in this case petitioner was 71 years old. He had practiced dentistry in the Dayton, Ohio area for 47 years. By the year in issue, 1981, petitioner had made arrangements with two younger dentists to take over his dental practice gradually, commencing in 1981 and continuing through 1985. He agreed to reduce his practice and his income by 25 percent each year to 75 percent at the end of 1981, to 50 percent at the end of 1982, and to 25 percent at the end of 1983. In 1984 and 1985, he would continue to receive 25 percent of the income of the practice. Thereafter, he would be entirely retired from the practice of dentistry. Petitioner had started a program of *553 investments in the early 1970's. During the period from the early 1970's until the date of trial, petitioner invested in an orange grove and also in raw land. During that time petitioner also invested in diamonds, gold, and silver. In 1981, with a view to his retirement, petitioner sought investments yielding steady income as opposed to long-term appreciation. He planned to hold any such investments for an indefinite period of time rather than to resell them. He sought investment assets that would not only provide early current income but would have the potential of generating increased income in the future. He looked primarily at tangible assets with extended lives that would not be subject to substantial obsolescence. He also sought to acquire assets that would remain in place where he could inspect them, as opposed to moveable assets that might require increased maintenance costs. Petitioner had considered investing in construction equipment, including a backhoe for $ 40,000, a dump truck for $ 20,000, a bulldozer for $ 50,000, a dump truck trailer for $ 15,000, and like equipment. He decided not to invest in such equipment, however, because he thought the construction *554 industry was at that time at a low ebb and that the construction equipment might sit idle and fail to produce a current stream of income. He also considered investments in real estate, apartment houses and condominiums, but he rejected this idea because he though the income would not be sufficient for his purposes, and that it would take a long time to realize a profit on such transactions. Petitioner during this time also considered investing in amusement park equipment. He considered an investment in a "Scrambler" amusement park machine for $ 75,000 but found that it was unavailable when he wanted to invest. He considered an investment of $ 500,000 in an amusement park ride called a "Music Train," but rejected the proposal because the amount of money was too large for him. He also considered a "Big Family Ride" for $ 200,000, but concluded it was "too big of an investment" for him. On September 10, 1981, petitioner executed two identical sets of documents entitled "Sales Agreement with Lease Annexed." Petitioner received these documents earlier in September from a Phillip S. Fry who had already signed the documents of president of Instant Billboard Corporation. [2] Pursuant *555 to each of these sets of documents, petitioner purportedly agreed to purchase two "Coupon Castle display racks." The purchase price for each set of two display racks was recited to be $ 6,000, payable $ 1,000 in cash on the signing of the contract with a note of indebtedness due to Instant Billboard Corporation on September 10, 1986 in an amount of $ 5,000, plus simple, uncompounded interest at an annual rate of 10 percent. The two printed form sales agreements differed only as to the serial numbers of the display racks; otherwise, they provided as follows: [3]
*556 SALES AGREEMENT WITH LEASE ANNEXED On this 10th of September, 1981, Instant Billboard Corporation, a Delaware Corporation, (hereinafter referred to as "Company") agrees to sell and convey and Paul E. & Betty G. Marshall trustees for the "Klondike Trust" [sic] (hereinafter referred to as "Owner") agrees to purchase, for the price and upon subject to the terms, covenants, conditions, and provisions herein set forth, two Coupon Castle display racks bearing serial number 1079 and serial number 1080.
1. The purchase price is Six thousand dollars and no/100. ($ 6,000.00), payable as follows: (a) Down payment of $ 1,000.00 due on the signing of this contract, by check subject to collection, payable to Company. (b) A note of indebtedness due on 9-10-86 for $ 5,000.00 payable to Company, plus simple, uncompounded interest at an annual percentage rate of ten percent (10%) on the unpaid note principal balance. Owner shall sign a note payable to Company on such terms. (c) The note of indebtedness is secured by a lien against the display racks. Owner will sign any necessary legal forms to perfect such lien in favor of Company. 2. The tradename *557 Coupon Castle and the Coupon Castle trademark shall at all times remain the sole property of Instant Billboard Corporation and/or Phillip S. Fry. 3. There is no broker or sales agent involved in this sales transaction other than either Tax Information Center or Orlando Advertising Agency, Inc. Any sales commission payable to either Tax Information Center or Orlando is the sole expense and sole liability of Company. 4. All understandings and agreements heretofore had between the parties hereto are merged in this sales agreement and a lease annexed to this agreement. These two contracts fully and completely express the agreement of the parties, and are entered into after full investigation, nether party relying upon any statement or representation, not embodied in these two contracts, made by the other herein. 5. Both Company and Owner shall have the right to assign both the sales agreement and the annexed lease all of their rights, titles, and interest thereunder, provided that notice of any such assignment shall be given to the other party at least twenty (20) days prior to the date of assignment and provided that, in the case of Owner desiring to make an assignment, the *558 Owner first pays to Company in full the note obligation provided for in paragraph 1 (b) of sales agreement. 6. This contract shall be governed by and construed in accordance with laws of the State of Ohio. Any litigation between the parties shall originate in the Common Pleas Court of Franklin County (Columbus), State of Ohio. Should there be litigation between the parties to this contract, the losing party shall pay the reasonable attorneys' fees and court costs incurred by the prevailing party. 7. This contract may not be changed or terminated orally. The stipulations of this contract are to apply to and bind the heirs, executors, administrators, and assigns of the respective parties. [Underscoring represents blanks in the form contract which had been filled in as indicated.] On September 10, 1981, petitioner also signed each of the two printed form lease agreements that were attached to the two sales agreements. Pursuant to these lease documents, petitioner purportedly leased back to the seller, Instant Billboard Corporation, the display racks that he had just purchased. According to the terms of each lease agreement, the two display racks would be leased back for *559 a total of $ 200 rental per year, payable each October 1 over a five-year period from October 1, 1982 through October 1, 1986. With the exception of differing serial numbers, each lease contained the following pertinent provisions: [4]
LEASE This lease agreement, made the 10th day of September, 1981, between Paul E. & Betty G. Marshall Trustees for the "Klondike Trust [sic] (hereinafter called "Owner") and Instant Billboard Corporation, a Delaware Corporation (hereinafter called "Company"). WITNESSETH: 1. Owner hereby leases to Company and Company hereby leases from Owner, two Coupon Castle display racks, bearing serial number 1079 and serial number 1080 for the following total lease payments: $ 200.00 on 10-1-82
$ 200.00 on 10-1-83
$ 200.00 on 10-1-84
$ 200.00 on 10-1-85
$ 200.00 on 10-1-86
There shall be a thirty-day period after the due date, in which payment may be made by Company without the Company being in default of this lease. 2. OWNERSHIP AND GUARANTEED BUY-BACK
*560 (a) It is agreed that the Coupon Castles display racks (but not name or trademark) are and shall at all times be and remain the personal property of Owner (subject to a lien in favor of Company for any unpaid installment note debt due to Company by Owner) and that upon termination of this lease, Owner: [sic] (1) Sell the two Coupon Castles to Company for a cash price of Six thousand dollars and no/100. ($ 6,000.00) due and payable to Company ninety (90) days after the termination of this lease (out of sales proceeds, Company shall subtract any note liability and interest due to Company by Owner). or (2) Re-negotiate a renewal extension of this lease on price and time terms then mutually agreed to by Company and Owner. The Company must select which of the above two options Owner wishes to select and send written acknowledgement of such option choice to Company by certified mail no later than ninety (90) days prior to the expiration of this lease. If Owner has failed to notify Company of Owner's desired choice by at least ninety (90) days prior to the expiration of this lease, both Owner and Company herein agree that the designated choice shall be first option (sale *561 of the sign by Owner) to Company at the stipulated purchase price in paragraph number 2(a)(1). No matter which of the above two options is selected by Owner, Owner shall pay the note principal and accumulated interest when the note is due under terms of this agreement. 3. In the event either or both Coupon Castle display racks is stolen or damaged or destroyed, the display racks will be repaired or replaced at the sole expense of Company. Whether Company elects to insure the physical value of the sign and its supporting structure is solely within the discretion of Company, except that Company shall maintain a general liability insurance coverage of at least two million dollars coverage at the sole expense of Company. Owner will not be named specifically by name but shall be covered by an insured category of "Owner." Moreover, the Company will indemnify Owner against death, personal injury or property damage where the death, personal injury or property damage is caused by an act of omission of Company or of Company's employee or agent in or in connection with the installation, maintenance, operation and removal of the advertising display racks sold to, and leased back from *562 Owner by Company. [Underscoring represents blanks in the form contract which had been filled in as indicated.] Prior to 1981, petitioner had never invested in any type of advertising sign or billboard. Petitioner did not subscribe to any magazines or periodicals involving advertising systems. He did not obtain any appraisals of the Coupon Castle display racks or of any type of billboard before executing the sales and lease documents. Petitioner testified that he was interested in purchasing and had purchased billboards of the type located along highways. The "Coupon Castle display racks" that he purportedly purchased pursuant to the agreements with Instant Billboard Corporation were portable structures such as are seen at shopping centers. Petitioner did not see the items before he executed the purchase and lease documents. He paid the $ 2,000 total cash payment called for in the two sets of documents. Although each agreement recited that petitioner would execute a $ 5,000 note in payment, and although each agreement further provided that the note would be secured by a lien against the property, petitioner in fact never executed any such notes. Petitioner has never seen *563 the Coupon Castle display racks he purportedly purchased. There is no evidence that he ever received any rental income from the display racks. Sometime prior to December 7, 1981, petitioner received in the mail from Mr. Fry two more sets of sales and lease documents, already signed by Mr. Fry. On December 7, 1981, having discussed the matter with his broker, his accountant, and his attorney, petitioner executed these two sets of documents entitled "Sales Agreement with Lease Annexed" relating to amusement rides. The record does not show that the broker, accountant, or attorney had any expertise or experience in regard to amusement rides. It appears that these persons did little more than look over the figures in the sale and lease documents and perhaps correct some transposed figures. Pursuant to the first of this December set of documents, petitioner purported to purchase for $ 100,000 a "Cobra" amusement ride from an entity identified as "Amusement Ride Corporation," which was another of Mr. Fry's vehicles. See n.2, supra. The payment was to take the form of a down payment of $ 20,000 in cash, which petitioner in fact paid. The balance of the purchase price, some $ 80,000, *564 was to be represented by a note of indebtedness payable on December 7, 1986, to another entity called Media Leasing Company. See n.2, supra. Petitioner, however, did not execute any note of indebtedness. The $ 80,000 indebtedness was to bear interest at a rate of 10 percent per annum payable, pursuant to the terms of the sales agreement, at $ 2,000 per quarter. The sales agreement stated, in pertinent part, as follows: SALES AGREEMENT WITH LEASE ANNEXED On this 7th day of December, 1981, Amusement Ride Corporation, an Ohio corporation, (hereinafter referred to as "Company") agrees to sell and convey and Paul E. & Betty G. Marshall * * * (hereinafter referred to as "Owner") agrees to purchase, for the price and upon and subject to the terms, covenants, conditions, and provisions herein set forth, 1531# Cobra.
1. The purchase price is One hundred thousand dollars and no/100. $ 100,000.00 payable as follows: (a) Down payment of $ 20,000.00 due on the signing of this contract, by check subject to collection, payable to Company. (b) A note of indebtedness for $ 80,000.00 payable to Media Leasing Company, plus simple, uncompounded interest *565 at an annual percentage rate of ten percent (10%) on the unpaid note principal balance. The amount of the interest payment per quarter will be $ 2,000.00 for five (5) years. The balance of said note is due and payable in full five (5) years after the signing of the note. Owner shall sign a note payable to Media Leasing Company on such terms. Payments commence 90 days after date of this agreement. (c) The note of indebtedness is secured by a lien against the equipment. Owner will sign any necessary legal forms to perfect such lien in favor of Media Leasing Company. 2. All understandings and agreements heretofore had between the parties hereto are merged in this sales agreement and a lease annexed to this agreement. These two contracts fully and completely express the agreement of the parties, and are entered into after full investigation, neither party relying upon any statement or representation, not embodied in these two contracts, made by the other herein. 3. Both Company and Owner shall have the right to assign both the sales agreement and the annexed lease, all of their rights, titles, and interest thereunder, provided that notice of any such assignment shall *566 be given to the other party at least twenty (20) days prior to the date of assignment and provided that, in the case of Owner desiring to make an assignment, the Owner first pays to Media Leasing Co. in full the note obligation provided for in paragraph 1 (b) of sales agreement. 4. This contract shall be governed by and construed in accordance with laws of the State of Ohio. Any litigation between the parties shall originate in the Common Pleas Court of Franklin County (Columbus), State of Ohio. Should there be litigation between the parties to this contract, the losing party shall pay the reasonable attorneys' fees and court costs incurred by the prevailing party. 5. This contract may not be changed or terminated orally. The stipulations of this contract are to apply to and bind the heirs, executors, administrators, and assigns of the respective parties. [Underscoring represents blanks in the form contract which had been filled in as indicated.]
At the time he signed the Cobra sale document, petitioner also executed a document pursuant to which he purported to lease the Cobra amusement ride to the seller, Amusement Ride Corporation, for a period of five years. The rental *567 payments to petitioner pursuant to that lease were to be $ 2,600 per quarter over the period of five years. The agreement, in pertinent part, [5] provided as follows: LEASE This lease agreement, made the 7th day of December 1981, between Paul E. & Betty G. Marshall trustees for the "Klondike Trust" (hereinafter called "Owner") and Amusement Ride Corporation, an Ohio Corporation, (hereinafter called "Company" [sic]). WITNESSETH: 1. Owner hereby leases to Company and Company hereby leases from Owner 1531# Cobra, (hereinafter referred to as equipment) for the total monthly lease payments of $ 2,600.00 per quarter for a period of five (5) years after the signing of this lease. Payments to commence ninety (90) days after the date of this agreement. There shall be a thirty-day period after the due date, in which payment may be made by Company without the Company being in default of this lease. 2. OWNERSHIP, OPTION TO BUY BACK OR GUARANTEED OFFER TO LEASE BACK (a) During the period of the leasehold, it is agreed that the equipment *568 is and shall at all times be and remain the personal property of Owner (subject to a lien in favor of Company for any unpaid installment note debt due to Company by Owner). (b) Ninety (90) days prior to the termination of this leasehold, Owner shall, in his sole discretion, set an asking price and terms for sale of the equipment back to Company. This desired asking price and terms shall be conveyed by certified mail to Company. Upon receipt by Company of such asking price and terms, Company shall have thirty (30) days to elect one of the following options: (1) Accept the price and terms offered by Owner for the sale of the equipment by Owner to Company; or (2) re-lease the equipment for five additional years at the same yearly rental payment provided for in the original five-year leasehold. If owner fails to establish an asking sale price and terms within the ninety (90) day time period provided for above, Company shall have the sole discretion in choosing between two options: (1) The cash purchase of the equipment at the original purchase price paid by Owner when Owner purchased the equipment from Company or (2) re-lease the equipment for five additional years at the *569 same yearly rental provided for in the original five-year leasehold. Under any of the above options, owner shall pay owner's note payable due to Media Leasing Co., when due. * * * Also on December 7, 1981, petitioner executed a document entitled "Sales Agreement with Lease Annexed" regarding the property identified as a "Scat," another type of amusement ride. the documents recited that the Scat was being sold to petitioner for $ 75,000, payable $ 15,000 in cash, with the $ 60,000 balance evidenced by a note payable to Media Leasing Company after a period of five years. The obligation would bear simple, uncompounded interest at the rate of 10 percent of the unpaid principal balance. The amount of the interest payment per quarter was to be $ 1,500 for five years. Pursuant to the Lease Agreement, petitioner leased the Scat machine back to the seller, Amusement Ride Corporation, for a period of five years. The rentals to be paid to petitioner were to be $ 1,950 per quarter for the five-year term of the lease. In all other particulars the sales agreement and the lease agreement were identical to those executed for the Cobra machine. [6] At the time petitioner received the sale *570 and lease documents for the Cobra and for the Scat amusement rides, most of the documents had already been signed for by Phillip S. Fry on behalf of the Amusement Ride Corporation. [7]
*571 The Cobra and Scat machines were quality amusement "thrill" rides. They could be expected to last up to 25 years with proper maintenance. These rides were not new when petitioner signed the agreements in 1981, but they were in existence and in service at the Paradise Lake Amusement Park in Ohio when that park first opened for business on July 4, 1981. They were not at that site in 1980, because the amusement park itself was being constructed at that time. However, the record does not establish when or by whom the Cobra and Scat amusement rides were initially acquired as new property. There is no evidence as to when the rides were first placed in service, whether at the Ohio park or elsewhere. At the time the sale and lease documents were executed by petitioner with respect to the Cobra and Scat, petitioner had not obtained any appraisal or valuation of the equipment. There is no evidence in the record as to the fair market value of these amusement rides or as to the physical condition of the rides in December of 1981. Petitioner had not seen the Cobra or Scat equipment at the time he executed the sale and lease documents. Petitioner at no time insured the Scat or the Cobra *572 machines for the risk of loss or for the risk of liability, but merely relied upon apparently unwritten representations that the seller (or sellers) would "take care" of insurance. Petitioner never signed any note for the indebtedness on either the Cobra or the Scat machine notwithstanding representations in the sales agreement documents that he would do so. Petitioner did not check to determine whether the Cobra and Scat were subject to any liens or security interests before he executed the sale and lease documents. Petitioner did not obtain a license or any bonding with respect to the Cobra or Scat amusement park ride equipment, again relying on the apparently unwritten assurance of the seller or sellers that it (or they) would take care of such matters. When the sale and lease documents were executed, petitioner had no actual knowledge or records of past maintenance of the Cobra and Scat equipment. Petitioner had no knowledge as to when the purported seller of the equipment, Amusement Ride Corporation, had purchased either the Cobra or the Scat. [8] Unlike the display rack sales and lease agreements, the documents executed with respect to the Cobra and Scat amusement ride equipment *573 contained no provisions with respect to insurance coverage or other indemnification. With respect to the amusement park rides, petitioner stated that it was his intention at the end of the five-year lease term to set the resale price of the machinery very high. The terms of the lease would thus force the seller to re-lease the machinery from petitioner on the original terms for another five years, rather *574 than to exercise the other option under the lease of repurchasing the machinery at the price set by petitioner. Although petitioner had stated that he sought investments with a possibility of increased income, he conceded that, as executed, the leases at issue would provide only a fixed amount of rental income and that any increased use of the Cobra and Scat rides by park patrons would not increase his income in any way. Petitioner presented at trial no records of income from the amusement rides. [9]
*575 On April 10, 1982, petitioner wrote a check made out to "Susan Fry Pres. TIC." for $ 750. Petitioner testified that the check was issued for maintenance for the equipment at issue. The record does not explain why TIC would be involved in any such maintenance, and this may have been a sales commission on the display racks. See n.2, supra. However, the check was endorsed by "Susan Fry Pres. TIC," and then endorsed "Sports Paradise Family Ent. Park for Deposit Only," another name for the Paradise Lake Amusement Park. He identified Susan Fry as an employee of the sam eTax Information Center operated by Phillip S. Fry. See nn.2, 8, supra. On May 1, 1982 petitioner wrote a check made out to Media Leasing company in the amount of $ 3,500. On the check is a memo line indicating "Cobra 2000 Scat 1,500." The check was endorsed by "Media Leasing Co." and then by "Amusement Ride Corp. for Deposit Only." Petitioner testified that these amounts were paid as interest pursuant to the provisions of the sales agreements. See n.9, supra.
Petitioners filed their 1981 tax return in June of 1982, pursuant to an extension of time for filing. On that return petitioners claimed a deduction *576 for depreciation on the billboard displays of some $ 1,800. They also claimed a deduction for depreciation with respect to the Cobra amusement ride of $ 15,000 and with respect to the Scat amusement ride of $ 9,000. They further claimed an investment tax credit of $ 3,363 relating to these items, that being the total amount of their tax liability, and hence reported no income tax liability for that year and carryback of the balance of the investment credit. [10] Thereafter petitioner wrote a check on June 15, 1983 made out to "Ride Owners Joint Venture" in the amount of $ 1,750. The check appears to have been endorsed "For Deposit Only" by the payee. Petitioner testified that the check was for the expenses of moving the Scat and Cobra equipment to Texas. The record does not show the nature of the Ride Owners Joint Venture, or what role if any it played. The entire amusement park did, in fact, move to Texas in 1983 in order to take advantage of the longer amusement ride season. In a statutory notice *577 of deficiency dated October 13, 1983, respondent disallowed the depreciation deductions and investment tax credits claimed with respect to the display racks and amusement rides. Petitioners timely filed a petition in this Court seeking a redetermination of the resulting deficiencies. OPINION In 1981, petitioner purportedly purchased four advertising display racks and two amusement park rides. He actually paid 20 percent of the purchase price in cash for each of these items, $ 2,000 for the display racks and $ 35,000 for the amusement rides. He also agreed to execute notes payable in five years for the balance. The notes were to bear simple, uncompounded interest at an annual rate of ten percent, payable quarterly. Petitioner never executed any notes. At the time he executed the sales agreements for the display racks and amusement rides, petitioner also executed leases, leasing them back to the seller for a period of five years. At the end of the lease period for the display racks, petitioner could either negotiate a new lease on price and time terms mutually satisfactory or sell the display racks back to the seller for the original purchase price. At the end of the lease period *578 for the amusement rides, petitioner would either negotiate their resale to the seller at a mutually satisfactory price or require the seller to execute another five-year lease on the same terms as the expiring lease. At issue here is whether petitioner is entitled to depreciation deductions and investment tax credits relating to the display racks and amusement park rides. [11] Respondent's broad assault on petitioner's display rack and amusement park ride transactions includes several overlapping and alternative arguments. Respondent's profit-objective argument, if accepted, would be wholly dispositive of the case before us. We will therefore first address the issue whether the transactions involving the display racks and amusement park rides were activities not engaged in for profit within the meaning of section 183. [12]
*579 Whether an activity is engaged in for profit turns on whether the taxpayer entered into or carried on the activity with an actual and honest objective of making a profit. Elliott v. Commissioner,90 T.C. 960 (1988); Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). [13]
As this Court has previously stated, section 183[14] is not a disallowance provision, but rather allows a taxpayer to deduct certain expenses that he could not otherwise deduct. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), *580 affd. without published opinions sub nom. Hook v. Commissioner, Krasta v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,734 F.2d 5, 6-7, 9 (3d Cir. 1984); Brannen v. Commissioner,78 T.C. 471, 500 (1982), affd. 722 F.2d 695 (11th Cir. 1984). If an activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1). The activities at issue here concern only depreciation deductions and investment tax credits attributable to petitioner's activities concerning the display racks and amusement rides. For 1981, the year in issue, these items generated no gross income. Thus if we find that these activities were not engaged in for profit, no part of the depreciation deductions or credits *581 at issue is allowable for 1981. *582 Petitioner thus must establish that he entered into the transactions in regard to the display racks and amusement park rides with an actual and honest profit objective. Fox v. Commissioner, supra,80 T.C. at 1006; Dreicer v. Commissioner, supra,78 T.C. at 644-645. While a reasonable expectation of profit is not required, petitioner must have had an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs., Beck v. Commissioner,85 T.C. 557, 569 (1985); Flowers v. Commissioner,80 T.C. 914, 931 (1983); Dreicer v. Commissioner, supra,78 T.C. at 644-645; Allen v. Commissioner,72 T.C. 28, 33 (1979); Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The issue is one of fact to be resolved on the basis of all the surrounding circumstances. Beck v. Commissioner, supra,85 T.C. at 570; *583 Flowers v. Commissioner, supra,80 T.C. at 931-932; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Petitioner has the burden of proving the requisite profit objective. Rule 142(a); Beck v. Commissioner, supra;Flowers v. Commissioner, supra;Golanty v. Commissioner, supra,72 T.C. at 426. In making this factual determination, we give greater weight to objective factors than to the taxpayer's mere statement of his intent. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, supra;Flowers v. Commissioner, supra;Siegel v. Commissioner, supra,78 T.C. at 699; Churchman v. Commissioner,68 T.C. 696, 701 (1977). Section 1.183-2(b), Income Tax Regs., lists some nine of the relevant factors to be considered in determining whether an activity is engaged in for profit. [15] However, all nine factors do not necessarily apply in every case, and those that do not need not *584 be discussed where no purpose would be served. See, e.g., Waddell v. Commissioner,86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988). It is well established that the term "profit" in the context of section 183 means economic profit, independent *585 of tax savings. Soriano v. Commissioner,90 T.C. 44, 54 (1988); Herrick v. Commissioner,85 T.C. 237 (1985); Surloff v. Commissioner,81 T.C. 210 (1983). Additionally, although section 183 speaks only in terms of the disallowance of deductions, it is clear that no investment credit is allowable for property used in an activity not engaged in for profit. See secs. 48(a)(1), 167(c), 168(c), and 183(c); Hagler v. Commissioner,86 T.C. 598, 622 (1986), affd. without published opinion sub nom. Dahlmeier v. Commissioner,822 F.2d 63 (11th Cir. 1987). [16]
The facts of this case establish that petitioner lacked the requisite profit objective,. Indeed, the documents he produced show that the transactions at issue almost guaranteed losses. Petitioner first purchased two sets of advertising displays. Each set consisted of two "Coupon Sales display racks." With respect to each of these two *586 sets, petitioner paid $ 1,000 down and agreed to execute a note to the seller, due in five years, for another $ 5,000. Petitioner agreed to pay interest of $ 500 per year on each of these notes, and then leased the display racks back to the seller for a rental of $ 200 per set per year. This transaction thus yielded an annual net loss to petitioner of $ 300 per set -- clearly not a profit-making situation. At the end of the five-year term, petitioner had the right to sell the display racks back to the seller at the original purchase price. The resale, however, would only restore to petitioner his purchase price; it would do nothing to recoup the $ 300 annual loss per set generated by the transaction. We recognize that, under the terms of the lease agreement, petitioner could attempt to negotiate a new lease with the seller. Nothing in the documents, however, bound the seller to accept such a new lease, nor, more to the point, did it bind the seller to enter into an agreement that would generate a profit for petitioner. Similarly, provisions that petitioner could assign the lease after paying off the note obligations fail to show that any such assignment would be profitable, *587 or even feasible. There is no evidence in the record as to the fair market value of the display racks in 1981, let alone any evidence as to their residual value at the end of the five-year lease period. Our conclusion that petitioner has failed to prove the requisite profit objective is reinforced by his almost complete failure to demonstrate that he entered into, or conducted, his display racks transaction in a businesslike manner. With respect to the display racks, petitioner not only entered into a flatly losing proposition, he also made basic errors in the nature of the purported purchase. He thought he was buying stationary billboards of the type seen along highways, when, according to the terms of the sales agreement, he instead obtained some portable "Coupon Sales display racks." There is no evidence that petitioner ever saw the display racks either before or after he purportedly purchased them. Petitioner did not establish that he paid the interest due upon the debt purportedly incurred in payment for the display racks. He produced no evidence of the receipt of any rental payments for the display racks, nor did he report any such income on the income tax returns in evidence. *588 Petitioner produced no documents of title, other than the bare "Sales Agreement With Lease Annexed." Petitioner, moreover, possessed no expertise or experience in regard to advertising displays, nor did he consult with any qualified person in regard to such property. He expended no discernible time or effort in attempting to make the advertising displays a profitable activity. There is no evidence that he consulted with anyone, or hired anyone, who possessed the expertise to make the advertising display racks into a profitable transaction. It is difficult to conceive of an activity being conducted in a less businesslike manner. Moreover, in contrast to the apparent $ 600 annual economic losses arising from the display rack transactions, petitioner claimed substantial tax deductions and credits. For 1981, the year in issue, he made $ 2,000 cash down payment for the four display racks. In his 1981 tax return, however, he claimed a $ 1,200 investment tax credit, interest deductions of $ 336, and $ 1,800 in ACRS depreciation deductions. Presumably petitioner intended to claim the ACRS deductions and interest deductions each year for the five-year duration of the leases. As noted *589 earlier, however, tax savings from an activity are not to be considered in determining whether that activity was entered into with the requisite profit objective. Indeed, here, the existence of tax savings, against a virtual certainty of economic losses absent such tax savings, is a further indication that petitioner merely purchased tax benefits and did not enter into the transactions with an actual and honest objective of seeking an economic profit as required by section 183. Petitioner wholly disregards the relevant figures when he insists that he entered into the display rack transactions with the requisite profit objective. He urges, for example, that the investment in the "Coupon Sales display racks" made sense economically, because he would receive gross rents of $ 400 on the two sets of display racks, a 20 percent return on his total down payments of $ 2,000. That would be true only if petitioner knew he did not have to pay the balance of $ 5,000 per set and knew that he did not have to pay the annual interest payments. However, assuming but not deciding that the debt obligations were bona fide, petitioner's "profit" figures completely overlook the economic reality that *590 the gross receipts of $ 400 must be reduced by the associated expenses, here, interest charges of $ 1,000, to produce a true picture, that is, an annual loss of $ 600. Petitioner's claimed 20 percent profit, in reality, is a losing proposition. Petitioner has thus failed to establish that he possessed the "actual and honest" profit objective required by section 183 as prerequisite to claiming the depreciation deductions and investment tax credits attributable to the display racks. The amusement ride transactions are equally lacking in any indication that they could yield profit. Under the sale and lease documents pertaining to the "Cobra" transaction, for example, petitioner paid $ 20,000 in cash and agreed to execute a note in favor of the seller (or sellers) for $ 80,000, due in five years. He further agreed to pay interest of $ 2,000 per quarter on the note. He then leased the machine back to the seller for rentals of $ 2,600 per quarter. The ostensible prospect of a profit of $ 600 per quarter (or $ 2,400 per year) was overshadowed, however, by the requirement in the documents that petitioner would have to pay off the $ 80,000 note in five years. Five years of a net annual *591 profit of $ 2,400 yields only $ 12,000 -- not nearly enough to pay off the $ 80,000 obligation. Plainly the transaction did not make economic sense; as constituted, it would not and could not yield a profit. The "Scat" amusement ride was governed by similar provisions. The sale and lease documents provided that the Scat would pay rentals of $ 1,950 per quarter, at an interest cost of $ 1,500 per quarter. The resulting profit of $ 450 per quarter, or $ 9,000 at the end of the five-year period, was again overshadowed by the requirement that, at the end of five years, petitioner would be required to pay off a $ 60,000 indebtedness on the purchase note. Again, petitioner would be $ 51,000 short of the amount needed to pay off that balance, and there is no possible way for the transaction to yield a profit. To be sure, the leases for each of the rides provided that petitioner could set a price for repurchase of the machines by the seller-lease at the end of the five-year period. Nothing in the lease required the seller-lessee to repurchase the rides at the price petitioner set. Such a provision thus provided no basis for anticipating a profit on the machines. The lease provisions *592 for the "Cobra" and "Scat" rides each also indicate that, if the seller-lessee refused to repurchase the machines at the price set by petitioner, petitioner could then force the seller-lessee to enter into another five-year lease on the same terms as the first lease. This provision, however, falls short on showing any possibility of a profit. For example, as shown above, the Cobra machine would have yielded a net income of $ 12,000 over the five-year term of the first lease. The lease, however, further provided that the indebtedness would have to be paid off at the end of the first five-year period, before execution of a new lease. Thus, even assuming that this $ 12,000 net income was used to reduce the purported $ 80,000 debt obligation, petitioner would have to pay off the $ 68,000 balance before entering into the new lease. The new lease would again provide rentals of only $ 10,400 per year, or a total of $ 52,000 for the subsequent five years. On the papers before us, it thus appears that even ten years after entering into these transactions, petitioner would still be faced with a loss of $ 16,000 -- the difference between the $ 68,000 paid off and the $ 52,000 received -- with *593 no demonstrated prospect of recouping that amount either through a lease or sale. The situation would be the same for the Scat ride, with rental income of only $ 39,000 for the second five-year lease period, far less than the $ 51,000 balance of the purchase price that petitioner would have had to pay before he could obtain the second lease. Again there was no prospect that petitioner could assign the Cobra and Scat leases profitably. Nor is there any prospect that petitioner could sell the machines at a profit. There is no evidence in the record as to the fair market value of the Cobra and Scat amusement rides in 1981, let alone as to their residual value at the end of the first or second five-year lease period. Petitioner also has not been able to demonstrate a businesslike manner of conducting the amusement ride activities sufficient to overcome the clear indication, left by the sale and lease documents, that he did not enter into the amusement ride activities with an actual and honest profit objective. There is no indication that petitioner had any expertise or background with respect to amusement park rides. He had no knowledge of the "Cobra" and "Scat" machines, in particular. *594 He did not obtain any disinterested appraisals of the machines, nor did he obtain any documents showing that the title to the machines was clear, or that the machines were in fact first placed in service in 1981. He obtained no estimates of expenses associated with the amusement ride enterprise. He had no information as to the physical condition or maintenance record of the rides. Moreover, it seems obvious that an owner of amusement park rides would be absolutely certain that he was insured against liability arising from the operation of the machines as well as against loss or damage to the rides themselves. Here, however, petitioner neither insured the equipment, nor did he ascertain that any other party had obtained insurance with respect to the equipment. He merely relied upon unwritten assurances that insurance would be taken care of. Petitioner also relied upon the seller to take care of the bonding or licensing requirements pertinent to operation of the machines in Ohio. And although the machinery was "used," petitioner never saw the rides before he purportedly purchased them for the $ 175,000. Additionally, petitioner's transaction in regard to the machines does not *595 square with the economic rationale given for acquiring them. Petitioner urged that he sought investments that would produce a current source of income; yet, as we have shown, the terms of the sale-leaseback virtually assured that there would be little or no income for the term of the lease. There was no provision for increased income based upon use or earnings of the amusement rides; the amount of rentals that could be received by petitioner was fixed by the terms of the lease. Neither was there any prospect that the machines themselves would appreciate in value. Indeed, as petitioner candidly testified, "they're making newer and better ones every year." Moreover, $ 140,000 plus interest -- on the assets at issue. These obligations would be payable in five years, when petitioner was 76 years old and fully retired from his dental practice. It is thus difficult to perceive any actual and honest objective of making a profit in these transactions. Petitioner's arguments about the profitability of his amusement rides are again unpersuasive. He urges that the annual gross receipts from the Cobra and Scat would produce a 10.4 percent return on their purchase price -- wholly ignoring, *596 as we have already pointed out, that the gross receipts will be offset by interest payments. As already shown, petitioner could not begin to pay both the interest and the purchase price which, in entering the transaction, he had ostensibly bound himself to do. [17]
Petitioner gets no further with his contention that he had a 12 percent "cash flow" when comparing the net rentals to the cash down payment. [18] By focusing on the net rentals' percentage return upon the down *597 payment, petitioner completely ignores the total payment -- the down payment plus the combined $ 140,000 balance on the note obligations allegedly incurred when he entered into the transactions here involved. Again, as discussed earlier, petitioner's anticipated net return could not begin to pay off both the interest obligations and the debt obligations for the amusement rides when, in five years, those obligations allegedly became due. As with the advertising display racks, petitioner's tax motivations for investing in the amusement rides are far more convincing than any economic profit objective. He paid $ 35,000 cash down payments *598 on the rides ($ 20,000 for the Cobra and $ 15,000 for the Scat). On the 1981 tax return, he claimed an investment tax credit of $ 12,500, and ACRS depreciation deductions of $ 24,000 in connection with the amusement rides. In the amended return for the next year, he claimed another $ 38,500 in ACRS deductions. It appears that, over the anticipated five-year "recovery period," or depreciable life of the machines, the additional claimed tax advantages for the rides would have been substantial. Yet, as we have noted above, our inquiry is whether the transaction was entered into for economic profit within the meaning of section 183, not tax "profit." Again, the prospect of economic losses and tax savings show that petitioner has not established that he possessed the actual and hones objective of seeking an economic profit. Petitioner does not aid his cause by arguing that his profit objective should be evaluated from the standpoint of amusement park machine owners, rather than as amusement park machine operators.When taxpayers have not directly carried on the activity at issue, we *599 have been willing to evaluate the profit objectives of the enterprise by examining the background and functions of the promoters or managers of the enterprise. See Beck v. Commissioner, supra,85 T.C. at 572 (1985; Fox v. Commissioner, supra,80 T.C. at 1001-1008 (1983); Brannen v. Commissioner,78 T.C. 471, 508 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Here, all the activities seem to be those in which Phillip S. Fry played a dominant part. He was not, however, a witness in these proceedings. The record indicates that he was an investment advisor (through the Tax Information Center), the president of Instant Billboard Corporation (and the possessor of rights to the "Coupon Sales" name), and the president of the Amusement Ride Corporation. This listing of occupations, however, fails to prove that Fry was expert in any of them. Certainly nothing is presented as to Mr. Fry's background or activities that would overcome our determination, on the record before us, that no profit was objectively obtainable by petitioner from his activity in regard to the display racks or amusement rides here at issue. Based on *600 the entire record, we cannot conclude that petitioner has entered into or carried on the activity at issue with an "actual and honest" objective of making a profit. Accordingly, we hold that petitioner is not entitled to the ACRS depreciation deductions nor to the investment tax credits claimed in 1981 with respect to the display racks and amusement rides. Our resolution of the section 183 issue makes it unnecessary for us to address the other issues raised by respondent. [19]
*601 To reflect the concessions and the above holdings, Decision will be entered under Rule 155.
Footnotes
1. The parties agree that petitioners' reported income for 1981 should be increased by dividends in the amount of $ 263. The parties additionally agree that respondent's proposed increase in the amount of rental income on real property of $ 8,581 was incorrect. The parties further agree that petitioners' allowable deduction for general sales tax will be automatically adjusted pursuant to the Court's resolution of other matters in this proceeding. Finally, the parties have agreed that petitioners are not entitled to interest deductions for the year 1981 relating to the advertising displays and amusement park rides here at issue. ↩
2. Mr. Fry was involved in an organization called the Tax Information Center (TIC) which he used to advise clients on investments. Mr. Fry used a number of entities, including Instant Billboard Corporation and Amusement Ride Corporation, which had the same address of 68210 Boden Road, New Concord, Ohio 43762. Media Leasing Company was another Fry entity related in some way to Amusement Ride Corporation. Tax Information Center as referred to in the sales documents as the broker or sales agent entitled to receive a commission on sales of the display racks. ↩
3. Petitioners were referred to as "Trustees for the Klondike Trust" in each of the four sales agreements and leases involved in this action. The parties, however, have agreed that references to the "Klondike Trust" may be ignored and the transactions herein may be deemed to have been those of petitioners individually and not as trustees of the "Klondike Trust." ↩
4. the portions omitted from the quoted lease agreements duplicate paragraphs 2, 4, 5, 6, and 7 of the sales agreements. ↩
5. The portions omitted from the quoted lease agreements duplicate paragraphs 2, 3, 4, and 5 of the sales agreements. ↩
6. Appended to the "Scat" sales and lease agreements (but not to the equivalent Cobra documents) was a "Notice of Cancellation," dated December 10, 1981, addressed to petitioner. It advised him that within five days he could cancel the transaction with Amusement Ride Corporation by giving notice to Instant Billboard Corporation -- apparently the sellers and lessees of the "Coupon Castle" display racks mentioned above. Petitioner paid the $ 20,000 down payment on the Cobra and the $ 15,000 down payment on the Scat by his check dated December 18, 1981, in the amount of $ 35,000 payable to Amusement Ride Corporation. ↩
7. The sale agreement for the Scat machine was signed by Fry. The copy of the "Lease" document for the Scat machine, however, contained no signature on the line labeled "Amusement Ride Corporation by its President, Phillip S. Fry." The evidence also included a separate second draft of the "Scat" sales agreement which had been altered to change the price of the machine from $ 60,000 to $ 75,000. Although signed by petitioners and notarized, Fry did not sign this draft either. Petitioner's explanation of how these incomplete documents were notarized was inconsistent, confusing, and wholly unpersuasive. ↩
8. Petitioner testified that he though that the payee of his debt obligations, Media Leasing Company, was a leasing agent for the amusement park, but he suggested he did not know whether that entity was related to Amusement Ride Corporation. We note that one of petitioner's checks to Media Leasing Company bore the endorsements of both Media Leasing Company and Amusement Ride Corporation. We note that another of petitioner's checks made payable to "Susan Fry, Pres. TIC" was also endorsed by Sports Paradise Family Ent. Park, which was another name for the Paradise Lake Amusement Park. While petitioner professed to know little about Mr. Fry and his various activities and entities, the Court found petitioner's testimony to be rather evasive and less than candid in that regard. ↩
9. Petitioner's original tax return for 1982 indicates $ 3,500 in income relating to the amusement park rides and no expenses or depreciation deductions. No mention is made in that return of the income from "Coupon Sales" in the year 1982. Thereafter, however, petitioners filed an amended tax return. Therein they claimed $ 38,500 in depreciation expense, plus maintenance and interest expenses totaling another $ 4,250 relating to the Cobra and Scat equipment. They offset these amounts by rents received of $ 4,550, to claim net loss deductions of $ 38,200. The $ 4,550 in income would appear to represent one quarter's rental income of $ 2,600 for the Cobra and $ 1,950 for the Scat, and the interest expenses of $ 3,500 would appear to represent one quarter's interest payment of $ 2,000 for the Cobra and $ 1,500 for the Scat. This amended return was filed after respondent issued the notice of deficiency in the case and shortly before the trial of the case. ↩
10. Petitioners thus claimed an investment tax credit carryback of $ 10,337 to the year 1978 arising from their investments in the advertising displays and amusement park rides. ↩
11. Since no interest was paid in 1981 and since that is the only year before the Court, we do not address the issue as to the deductibility of any interest expense. ↩
12. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
13. See also Zane v. Commissioner,T.C. Memo. 1988-392; Jenkins v. Commissioner,T.C. Memo. 1988-292↩. 14. Section 183, in relevant part, provides: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩. 15. These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7)the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is decisive; rather, we must consider all the facts and circumstances with respect to the activity. Sec. 1.183-2(b), Income Tax Regs.↩
16. See also Kaehn v. Commissioner,T.C. Memo. 1987-608; Williams v. Commissioner,T.C. Memo. 1987-308; Massengill v. Commissioner,T.C. Memo. 1986-159↩. 17. In making these calculations, petitioner apparently multiplied the $ 4,550 combined quarterly rental receipts for the Cobra ($ 2,600) and Scat ($ 1,950) to reach an annual income figure of $ 18,200. This represents a 10.4 percent return on the $ 175,000 combined purchased prices of the Cobra ($ 100,000) and Scat ($ 75,000). These figures, however, exclude interest payments of $ 3,500 per quarter, or $ 14,000 per year. They also fail to take into account the requirement of paying $ 140,000 in debt after five years. As noted earlier, petitioner's arguments suggest, if anything, that he did not regard himself as obligated to pay either the balance of the purchase price or the interest on the putative debt. ↩
18. This "cash flow" analysis apparently consisted of netting petitioner's rental incomes against the interest expense. Thus, for the Cobra, rentals of $ 2,600 less interest payments of $ 2,00 per quarter would yield a $ 600 quarterly profit, or $ 2,400 per year. For the Scat, rentals of $ 1,950 less interest payments of $ 1,500 per quarter would yield a $ 450 quarterly profit, or $ 1,800 per year. The combined $ 4,200 annual profit represents 12 percent of the $ 35,000 cash down payment made by petitioner when he executed the sales agreements. ↩
19. We think there is considerable merit in respondent's suggestion that no sales actually occurred here. On this record it would be difficult to find that the benefits and burdens of ownership of the display racks and amusement rides had actually passed to petitioner. The transactions appear to be more in the nature of financing arrangements whereby the "sellers" obtained some cash up front and petitioner in effect purchased tax deductions and credits. With the repurchase provision for the display racks, there is also a serious question as to whether petitioner could be considered "at risk" under section 465(b)(4). Under section 168, there are serious questions as to when the Cobra and Scat rides were originally purchased and placed into service. Under section 167↩ there would also be serious questions as to the age and useful lives of these rides.